**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

_____

LOUIS GIOIA,

               Plaintiff,

v.                                         No. CIV 00-1543 BB/LCS

PINKERTON'S, INC., a Delaware
corporation doing business in New Mexico,
and Pinkerton officials ROBERT HANZICH,
MIKE CREEDON, ED UNIS, and JOE
SHELTON, INTEL CORPORATION, a
Delaware corporation doing business in New
Mexico, and Intel officials JEFF
ARMSTRONG and MICHAEL LEVERENZ,

               Defendants.


**MEMORANDUM OPINION**

**THIS MATTER** comes before the Court for consideration of two motions for summary

judgment filed by the Pinkerton Defendants (Docs. 102, 106) and a motion for summary judgment

filed by the Intel Defendants (Doc. 82). The Court has reviewed the submissions of the parties and

the relevant law, and, for the reasons set forth below, will **GRANT** the motions for summary

judgment.

Plaintiff was employed by Pinkerton's as a security officer. Plaintiff was stationed at the Intel

facility in Rio Rancho, New Mexico. Intel and Pinkerton's had a contractual relationship under which

Pinkerton's provided security services for the Intel facility. At the time of the events in question here,

Plaintiff was stationed in the Command Center of the Intel facility. Plaintiff brought this action, alleging a federal cause of action under Title VII as well as several state-law claims, following his resignation in May 2000. All of the claims are brought against all Defendants. The Intel Defendants ("Intel") filed one motion for summary judgment addressing all of Plaintiff's claims; the Pinkerton's Defendants filed one summary-judgment motion directed at the Title VII claim and one motion asking for summary judgment on the state-law claims.

Preliminarily, the Court notes that its review of the summary-judgment motions has been hampered by the failure of Pinkerton's counsel and Plaintiff's counsel to comply with D.N.M. LR-Civ 10.6, regarding highlighting of exhibits. None of the exhibits submitted by Pinkerton's counsel and Plaintiff's counsel contained any highlighting or marking of any kind. The Court was therefore forced to examine every page of every exhibit. This has caused the Court to expend considerably more time than usual to examine the record in this case and reach a decision on the motions. Counsel are directed to comply with Local Rule 10.6 in the future.

"Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." Id. On a motion for summary judgment, the issue is "not whether [the court] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to

create a jury question." *Walker v. NationsBank of Florida*, 53 F.3d 1548, 1555 (11th Cir. 1995). The Court will consider Defendants' motions in light of these standards.

**Intel Motion**

**I. Title VII Retaliation Claim:** To establish a prima facie case of unlawful retaliation under the familiar *McDonnell Douglas* test, a plaintiff must normally prove: (1) he engaged in conduct protected under Title VII; (2) his employer took adverse action against him contemporaneously or subsequent to the protected activity; and (3) there is a causal connection between such protected activity and the adverse action or actions. *See Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993). In this case there is an additional issue present with respect to Intel -- Plaintiff must prove that Intel was his employer, for purposes of Title VII. *See generally Lambertsen v. Utah Dep't of Corrections*, 79 F.3d 1024 (10th Cir. 1996) (affirming summary judgment granted to defendant because plaintiff failed to raise issue of fact as to whether there was employer-employee relationship between defendant and plaintiff).[1]

**Prima Facie Case -- Intel as Employer:** Intel's first argument with respect to the Title VII claim is that, as a matter of law, Intel was not Plaintiff's employer, because Plaintiff was employed by Pinkerton's. *See Hale v. Marsh*, 808 F.2d 616 (7th Cir. 1986) (stating that an entity is not liable under Title VII for retaliation against another's employee). As Plaintiff points out, however, depending on the circumstances, a person may have more than one employer for Title VII purposes. *See Atchley v. Nordam Group, Inc.*, 180 F.3d 1143, 1153 (10th Cir. 1999); *see also Bristol v. Board of County Comm'rs of the County of Clear Creek*, 281 F.3d 1148 (10th Cir. 2002) (discussing ADA case but applying Title VII law concerning multiple employers). In the Tenth Circuit, "determining

---

[1] It should be noted that Plaintiff's Title VII claim cannot be raised against the individual Intel Defendants; the Tenth Circuit has rejected the possibility of supervisory liability, or co-worker liability, for Title VII violations. *See Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir.1996).

whether an entity qualifies as an employer is a fact issue for the jury." *Bristol*, at *15. The question in this case is therefore whether Plaintiff has presented sufficient facts to avoid summary judgment on this issue and have the question submitted to a jury.

In support of its request for summary judgment, Intel submitted evidence establishing the following facts: Plaintiff was hired by Pinkerton's; was not interviewed or in any way selected by Intel; was paid by Pinkerton's; was disciplined by Pinkerton's; served under a Pinkerton's supervisor; received performance evaluations from Pinkerton's; received his uniform from Pinkerton's; and was trained by Pinkerton's. (Creedon dep. pp. 98-100, Intel Exh. C; Shelton dep. p. 114, Intel Exh. B). In response, Plaintiff presented evidence indicating that he received his day-to-day assignments from Intel; that 90% of his work was performed for Intel people; that he was required to observe and abide by all "Pinkerton/Intel Policy and Procedures"; and that he and an Intel employee, David Crane, jointly created the Command Center manual detailing how security would respond when alarms came in to the Center. (Gioia depo. pp. 129-31, 290, Pltf. Exh. 1, Intel Exh. A; Crane depo. pp. 46-47, Pltf. Exh. 3). In addition, Plaintiff's supervisor, Robert Hanzich, testified in his deposition that Intel makes the rules, and Pinkerton's employees follow them. Hanzich also stated that he sent a memorandum to Command Center personnel, concerning the proper way to make a P.A. announcement, because Intel told him to do so. (Hanzich dep. p. 64, Exh. 5, Pltf. Resp. to Intel MSJ; Hanzich dep. pp. 38-39, Pink. Exh. 15).

The main focus for this Court's inquiry is the extent to which Intel had the right to control the means and manner of Plaintiff's performance. *See Bristol*, *14. Other factors of importance in such cases, with particular reference to this case, include the supervision under which Plaintiff worked; the question of who furnished Plaintiff's place of work and equipment; the method by which Plaintiff was paid; the manner in which his work relationship was terminated; whether Intel provided

Plaintiff annual leave or other employment-related benefits; whether the work was an integral part of the business of Intel; whether Plaintiff accumulated retirement benefits from Intel; whether Intel paid social security taxes on behalf of Plaintiff; and the intentions of the respective parties. *Id.*

Starting with the above list of "other factors" many point to a conclusion that Intel was not Plaintiff's employer. As noted above, Plaintiff was paid by Pinkerton's, not Intel; Plaintiff was supervised by Pinkerton's personnel, not Intel; Plaintiff resigned from employment with Pinkerton's, not Intel; Plaintiff accumulated no retirement benefits or annual leave from Intel;[2] and Intel paid no social security taxes on behalf of Plaintiff. Intel did, however, furnish the Command Center, where Pinkerton's assigned Plaintiff. Furthermore, while Intel's business is manufacturing computer chips, not providing security, the Command Center's responses to various alarms appear to have had the potential to save Intel large amounts of money; Plaintiff alone was involved in an incident that allegedly avoided evacuation of a fabrication unit, saving Intel millions of dollars in avoided costs. (Atchison dep. p. 23, Exh. 2, Pltf. Resp. to Intel MSJ)

As to the "main focus" of this Court's inquiry, Intel's right to control the means and manner of Plaintiff's performance, the facts appear to be in dispute. As noted above, Plaintiff appears to have operated under a Command Center manual prepared jointly by himself and an Intel employee, and Plaintiff was subject to "Pinkerton/Intel Policy & Procedures." There is conflicting evidence as to the source of Plaintiff's day-to-day assignments; he testified he received 90% of his work assignments from Intel, while Mr. Shelton, the Pinkerton's site manager, testified that no Intel manager had

---

[2] Plaintiff did testify at his deposition that "I believe" Intel paid a portion of his medical insurance "expense," although he was not positive. (Gioia dep. p. 289, Exh. A, Intel MSJ). Plaintiff's belief, however, is not sufficient to allow the Court to credit this statement as a fact. *See Cadle Co. v. Hayes*, 116 F.3d 957, 961 (1st Cir. 1997) (ruling that statement beginning "I believe..." is not entitled to any weight in the summary judgment balance, because statement made from personal belief is not same as statement made from personal knowledge); *see also Jameson v. Jameson*, 176 F.2d 58, 60 (D.C.Cir.1949) ("Belief, no matter how sincere, is not equivalent to knowledge.").

authority to give day-to-day assignments to Pinkerton's personnel. (Gioia depo. p. 290, Intel Exh. A; Shelton depo. p. 113, Intel Exh. B). Also, the testimony of Plaintiff's immediate supervisor, Mr. Hanzich, can be interpreted to show direct Intel control over Pinkerton's employees – Intel made the rules, and Pinkerton's followed them, and Intel directed Hanzich to send a memorandum concerning the performance of Command Center personnel with respect to P.A. announcements.

Applying the *Bristol* opinion to this case, the Court must conclude there is a genuine issue of material fact as to whether Intel should be considered Plaintiff's employer for Title VII purposes. The extent to which Intel actually controlled Plaintiff's day-to-day work assignments is in dispute, and that is the most important factor to be considered in addressing this issue. Summary judgment is therefore not appropriate on this question.

**Prima Facie Case -- Adverse Employment Action:** Intel's next argument is that Plaintiff did not suffer an actionable adverse employment action. It is true that many of the alleged acts of retaliation complained of by Plaintiff do not rise to the level of an "adverse employment action" that can be the basis of a Title VII claim. However, Plaintiff's demotion from the Command Center to patrol duty, with the concomitant reduction in pay from $11 per hour to $10 per hour, sufficiently altered Plaintiff's compensation, terms, conditions, or privileges of employment, as to constitute an adverse employment action. *See Lee v. New Mexico State University Bd. of Regents*, 102 F.Supp.2d 1265, 1274-76 (D.N.M. 2000) (discussing adverse actions that can be basis of Title VII claim; pay differential between 1.75% raise and 2% raise was sufficient loss of pay to be actionable); *see generally Jeffries v. Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998) (stating that this "circuit liberally defines adverse employment action."). The Court therefore rejects this portion of Intel's argument.[3]

---

[3] As part of its argument that Plaintiff suffered no adverse employment action, Intel cites cases holding that transfer to a different position, with a small cut in pay, is not a constructive discharge. This argument misses the point; an adverse action does not have to rise to the level of a

**Prima Facie Case -- Causal Connection:** Intel next contends Plaintiff has failed to raise a genuine issue of material fact as to the existence of a causal connection between Plaintiff's protected activity, his statement to Intel's investigator ("Skelly"), and any adverse employment action he suffered. This is the most difficult question to answer with regard to both Intel's motion and Pinkerton's Title VII motion. A brief recitation of the facts, viewed in the light most favorable to Plaintiff, is necessary. Plaintiff was employed with Pinkerton's, at the Intel facility, starting in 1994. After a relatively short time patrolling the grounds, he was transferred to the Command Center, a position of greater responsibility and somewhat higher pay. Plaintiff was an acknowledged expert concerning Command Center operations; as noted above, he helped prepare the Command Center manual, and one Intel employee rated Plaintiff as among the top three Command Center personnel with whom he had worked. (Atchison dep. pp. 10-11, Exh. 3, Pltf. Resp. to Pink. MSJ). Plaintiff's evaluations were uniformly good, and he had no disciplinary actions in his file.

In the fall of 1999, Plaintiff was working in the Command Center as part of Shift 5. Plaintiff's immediate superior was Pinkerton's employee Hans Brakob. Plaintiff, Brakob, and the rest of Shift 5 began to have difficulties with Jeff Armstrong, an Intel employee whose job duties required that he and Shift 5 work closely together. Armstrong was upset because he believed that Shift 5 personnel were spreading a rumor that he was having an affair with a Pinkerton's guard. (*e.g.,* Armstrong dep. pp. 17-20, Intel Exh. F). The atmosphere in the Command Center became tense and uncomfortable, as Armstrong slammed doors, glared at people, and refused to speak to anyone.[4] (*e.g.,* Gioia dep.

---

constructive discharge before it can be actionable as a retaliatory action under Title VII.

[4] Prior to the affair rumors, Armstrong had incurred the displeasure of Shift 5 by accusing Shift 5 of gambling on the job. The "gambling" consisted of collecting money from Command Center personnel, for purposes of jointly purchasing lottery tickets, with any proceeds to be shared equally. Armstrong apparently took offense to this practice, refused to participate, and complained to a Pinkerton's supervisor. (Shelton dep. pp. 71-73, Exh. 7, Pltf. Resp. to Pinkerton MSJ)

pp. 49-50, Intel Exh. A). Pinkerton's and Intel supervisors learned of the alleged affair and determined to put a stop to the "rumor-mongering." Brakob, as a supervisor himself, was responsible for filing a written report concerning the rumors. According to Pinkerton's, he did not do so in a timely manner, and he was removed from his Command Center position as a result. Rather than accept a different post with Pinkerton's, he resigned.

In early December 1999, Brakob filed a charge of discrimination with the E.E.O.C. He alleged that he had been harassed on the basis of ethnicity, by an Intel employee named Paul Hill. Hill allegedly called Brakob a Nazi, a baby killer, Hitler, and a Jew killer, and made inappropriate sexual comments about "blow jobs" and "broke dicks." (Exh. 8, Pltf. Resp. to Intel MSJ) Intel initiated an investigation into the matter. On January 20, 2000, Plaintiff was interviewed by an Intel human-resources employee, Susan Skelly. Plaintiff confirmed the accusations made against Mr. Hill, as did at least one other Shift 5 Command Center employee, John Matthews, as well as a number of Intel employees. (Skelly dep. pp.25-26, Intel Exh. E). Ms. Skelly decided the accusations against Mr. Hill were valid, and Mr. Hill was disciplined by Intel. During the interview with Ms. Skelly, Plaintiff also expressed strong objections to Jeff Armstrong's behavior and attitude toward Shift 5, when Ms. Skelly asked if he had complained about any Intel employee other than Mr. Hill. (*Id.* p. 36). Also, prior to Ms. Skelly's interviews, Pinkerton's on-site manager, Joe Shelton, sent a memo to Mike Creedon, Pinkerton's district manager, detailing complaints that Mr. Brakob had made about Jeff Armstrong and denying that Brakob had ever complained to him about Mr. Hill's language. (Exh. 12, Pltf. Resp. to Intel MSJ). Mr. Creedon was present during Ms. Skelly's interviews of Plaintiff and Mr. Matthews.

On January 24, four days after Ms. Skelly's interviews of Plaintiff and other Pinkerton's employees, Intel issued its monthly Client Service Report ("CSR"). Intel severely downgraded

Pinkerton's performance in several areas, stating there was a need to improve "Supervisory professionalism" in the areas of "Harassment; Trust/Respect in the Workplace, and Expectations on reporting and handling complaints." (Exh. 11, Pltf. Resp. to Intel MSJ). Mr. Creedon, echoed by Mr. Shelton, testified that the poor CSR expressed Intel's belief that Pinkerton's employees were not sensitized to the need to report or not accept the type of ethnocentric language Mr. Hill used in the Command Center. (*e.g.,* Creedon dep. p. 55, Exh. 4, Pltf. Resp. to Intel MSJ). Pinkerton's responded to the problem by bringing in a human resources specialist, who conducted "diversity training" regarding ethnicity and "locker room mentalities." (Creedon dep. pp. 45-46, Exh. 14, Pinkerton's MSJ) Following this response, Pinkerton's CSR scores started to rebound, and rose over the next two or three months. (Creedon dep. p. 53, Exh. 4, Pltf. Resp. to Intel MSJ).

Plaintiff testified that after the Skelly interviews, Shift 5 was subjected to unwarranted accusations and minor disciplinary actions. For example, Shift 5 was directed to stop all "locker room" talk, even though Mr. Hill had been the only one who engaged in that type of behavior. In fact, Sergeant Murphy, a Pinkerton's employee, went into the Command Center four days in a row to tell Shift 5 not to engage in such talk. (Gioia dep. p. 157, Exh. 1, Pltf. Resp. to Pink. MSJ). Furthermore, on February 29 Robert Hanzich sent Sergeant Murphy a memo directing that Shift 5 personnel be trained in proper P.A. announcement procedures, even though just prior to Christmas he had sent a memo thanking those same personnel for doing an excellent job. (Exh. 11, Pltf. Resp. to Pink. MSJ). Finally, at some point in March, Mr. Hanzich understaffed Shift 5 for several weeks, making it more difficult for Plaintiff and the others to perform their jobs. (Exh. 20, Pltf. Resp. to Intel MSJ)

In the meantime, Plaintiff's difficulties with Mr. Armstrong were continuing. According to Mr. Hanzich, Plaintiff blamed Mr. Armstrong for falsely reporting that Shift 5 personnel were still

using profanity in the Command Center. (Hanzich depo. p. 30, Pinkerton's Exh. 16). Plaintiff also discussed the language accusations with several Intel employees, who told him they did not perceive a problem. (Gioia dep. pp. 181-84, Pinkerton's Exh. 18). In March 2000, an incident occurred in which Mr. Armstrong was allegedly paged at home, failed to respond, was called and said he would be in shortly, but then did not show up until he was again paged and called. Plaintiff was interviewed by an Intel supervisor about this incident. (Exh. 14, Pltf. Resp. to Intel MSJ). Shortly thereafter, on April 3, Plaintiff was given a written disciplinary warning. (Exh. 16, Pltf. Resp. to Intel MSJ). This warning, from Mr. Shelton, discussed the apparent ongoing conflict between Plaintiff and Armstrong, and instructed Plaintiff to bring any concerns he might have to the attention of Pinkerton's or Intel Security management. Plaintiff was instructed not to discuss the matter with co-workers, contractors, or non-security Intel employees. Plaintiff has also presented hearsay evidence that, at some point during this time period, Mr. Armstrong made the statement, "I guess it's time to take somebody out," with reference to a dispute between himself and Plaintiff. (Crane dep. pp. 24-29, Exh. 3, Pltf. Resp. to Intel MSJ). The Intel supervisors who heard about the possible threat took it seriously enough to tell Plaintiff about it. (*Id.*) Mr. Armstrong was not disciplined as a result of this incident.

On April 9, 2000, Plaintiff received his quarterly One on One performance evaluation. (Exh. 12, Pltf. Resp. to Pink. MSJ). Originally, Sergeant Murphy gave Plaintiff an evaluation containing no "Does Not Meet Standards" marks. Lieutenant Hanzich, however, after discussing the matter with Mr. Shelton, rejected this evaluation and Plaintiff received an evaluation containing two such marks: the categories of "Demonstrates teamwork with peers" and "Demonstrates customer service skills in a professional manner." (Hanzich dep. p. 58, Exh. 5, Pltf. Resp. to Intel MSJ; Shelton dep. p. 10, Exh. 7, *Id.*). The overall evaluation was a "Meets Standards" evaluation. Plaintiff was not happy with the change in his evaluation and met with Mr. Creedon in mid-April to discuss it. Mr.

Creedon, however, refused to intervene in the matter. According to Mr. Creedon, the main reason for his refusal was the fact that Mr. Murphy had only supervised Plaintiff for six weeks, while Mr. Hanzich "saw the whole time period of the report." (Creedon dep. pp. 66-73, Exh. 4, *Id.*). During the meeting with Mr. Creedon, Plaintiff again expressed complaints regarding Jeff Armstrong. (*Id.*, pp. 102-03). Plaintiff also expressed his disagreement with a new ambulance-summoning policy imposed by Intel, which according to Plaintiff could cause life-threatening delay. Mr. Creedon investigated the issue and was not pleased because, according to him, Intel had already considered the objections raised by Plaintiff and had decided to stick with the policy. (*Id.*, pp. 74-75)

Approximately two weeks after Plaintiff's meeting with Mr. Creedon, Mr. Shelton decided to remove Plaintiff from the Command Center. As noted, this removal would have resulted in a cut of pay of $1.00 per hour, and would have significantly changed Plaintiff's work conditions. Mr. Shelton testified that he made the final decision to take this action, after discussing it with Mr. Creedon, Mr. Hanzich, Mr. Unis (another Pinkerton's supervisor), and Mr. Leverenz, the Intel employee in charge of security. (Shelton dep. p. 106, Pink. Exh. 29). According to Mr. Shelton, Mr. Leverenz made no suggestion or request that Plaintiff be removed from the Command Center. However, he did tell Mr. Shelton that while Plaintiff and Armstrong were both valued people, he could not afford to lose Armstrong in the Command Center because he was the only technician on site that could do the job. (Shelton dep. p. 116, Intel Exh. B). According to Plaintiff, Mr. Creedon told Plaintiff that Mr. Leverenz wanted Plaintiff out of the Command Center because Leverenz "perceived me as a smart ass..." (Gioia dep. 331, Intel Exh. A). On May 1, 2000, Plaintiff was given a memo concerning his removal from the Command Center. (Exh. 19, Pltf. Resp. to Intel MSJ). This memo cited "continuing friction between Pinkerton and our customers within the Command Center" as the reason for the action, and left open the possibility of Plaintiff returning to the Command Center

"after a suitable time." Plaintiff chose to resign rather than to accept the transfer. (Gioia dep. p. 202, Pink. Exh. 31).

In the absence of direct evidence of retaliatory intent, which is rarely present and is not present in this case, one means of making a prima facie showing of a causal connection is to establish that an adverse action closely followed the protected activity. However, unless the action is very closely connected in time to the protected conduct, Plaintiff must present additional evidence beyond temporal proximity to establish causation. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). According to the Tenth Circuit, a lapse of three months between the protected activity and the employer's action is too long a period of time to allow an inference of causation. *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997). In this case, there is evidence connecting Intel only to the following actions claimed by Plaintiff to be retaliatory: (1) the downgrading of Pinkerton's CSR; (2) the false accusations that all of Shift 5, not just Paul Hill, were using "locker room" language; (3) the memo concerning proper P.A. announcement procedure; and (4) the removal of Plaintiff from the Command Center.[5] Of these, only one action, Plaintiff's demotion from the Command Center, can be considered an actionable adverse employment action.[6]

---

[5] Intel has argued that there is no admissible evidence connecting Intel to the demotion, because the only evidence Plaintiff presented was his testimony that Mr. Creedon told him Mr. Leverenz thought he was a smart ass and wanted him out of the Command Center. The Court notes there was also Mr. Shelton's testimony to the effect that Leverenz told him he could not afford to lose Mr. Armstrong from the Command Center, even though both Plaintiff and Armstrong were valued people. Although the double-hearsay nature of the former statement gives the Court pause, the Court will consider these statements of Mr. Leverenz as admissions of a party-opponent. *See Ruffin v. Shaw Industries, Inc.*, 149 F.3d 294, 301-02 (4th Cir. 1998) (considering what would otherwise be hearsay and double-hearsay statements as admissions of party); *accord E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 551-52 (8th Cir. 1998) (stating that purported hearsay and double-hearsay statements would have been admissible even if objected to, as admissions of a party).

[6] The other three actions were not even directed at Plaintiff personally, and had no tangible impact on his working conditions, compensation, or potential for advancement. It should be noted

However, that action did not occur until May 1, 2000, over three months after Plaintiff's January 20 interview with Ms. Skelly. This is too long a time period, standing alone, to provide an inference of a causal connection between Plaintiff's interview and the subsequent demotion.[7]

Since Plaintiff lacks the requisite temporal proximity, he must rely on other circumstances if he is to raise an issue of fact concerning a causal connection between his interview and his demotion. Plaintiff argues, in effect, that Intel's strong reaction to Ms. Skelly's investigation and report are indicative of retaliatory intent. The problem with this argument is that neither Plaintiff nor Mr. Matthews, not any other Pinkerton's or Intel employee interviewed by Ms. Skelly, was singled out by Intel for adverse action following the interviews. Intel punished Pinkerton's as a whole by downgrading the January CSR, stating that Pinkerton's should have done more to ensure their employees reported behavior such as Mr. Hill's before it became a problem. Once Pinkerton's conducted the diversity training, the CSR ratings began to rise again, indicating that Intel's concerns were being met. Intel also allegedly falsely accused Shift 5 of using profanity in the Command Center, causing Sergeant Murphy to caution Shift 5 four days in a row. According to Plaintiff, this

also that the Court has not considered actions of Jeff Armstrong in this analysis, for several reasons. First, Armstrong's animosity toward Plaintiff, and vice versa, predated Plaintiff's interview with Skelly; second, the only evidence is that Armstrong did not know Plaintiff had been interviewed in connection with Brakob's EEOC claim; third, Armstrong had no authority over Plaintiff or ability to retaliate against him in a manner actionable under Title VII. Armstrong's actions, therefore, cannot be considered as evidence of retaliation against Plaintiff by Intel. *See, e.g., Williams v. Rice*, 983 F.2d at 181 (where actor did not know of protected conduct, the action cannot be considered retaliatory).

[7] The Court notes it is undisputed that Intel had no authority to hire, fire, or discipline Pinkerton's employees. However, assuming Intel could be considered an employer under Title VII, and had the power to strongly influence Pinkerton's behavior because of the economic control given to it by virtue of its contract with Pinkerton's, the Court can conceive of a situation in which, if Intel pressured Pinkerton's to take retaliatory action on Intel's behalf, Intel could be found liable under Title VII. That is why the Court has considered this claim against Intel viable at all.

was an attempt to cover up the Paul Hill problem by making it appear that all Command Center personnel engaged in this type of behavior. Aside from the fact that this is pure speculation on Plaintiff's part, even if Intel's motive was to cover up or soft-pedal the Hill issue, rather than to ensure that nothing similar happened again, that is not indicative of an intent to single out Plaintiff for retaliatory action due to his protected conduct. An intent to cover up an alleged EEOC violation by accusing an entire group of similar conduct cannot be equated with an intent to punish an individual who gave a statement during the investigation of the violation. *Cf. McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996) (punishment of a group states a cause of action only where offending individual's identity actually unknown). As to the memo concerning proper P.A. procedure, there is no conceivable connection between a memo concerning P.A. announcement procedures, issued February 29, and Plaintiff's interview over a month earlier.

Even Plaintiff's evidence concerning Mr. Leverenz' involvement in the demotion points toward a motive other than retaliation. Plaintiff's testimony that Mr. Creedon said Mr. Leverenz considered Plaintiff a "smart ass," and wanted him out of the Command Center for that reason, indicates nothing about a retaliatory intent. Similarly, Mr. Shelton's testimony that Mr. Leverenz said he could not afford to lose Mr. Armstrong from the Command Center indicates only that the problem was the friction between Armstrong and Plaintiff, and that of the two Mr. Leverenz would prefer that Armstrong stay in the Command Center. In short, Intel may have unfairly favored its own employee over Plaintiff, even though Mr. Armstrong was the cause of the tension in the Command Center; Plaintiff has certainly raised a genuine issue of fact about that point. However, he has not made a prima facie showing that Intel's motives were to retaliate against him for his interview with Ms.

Skelly.[8]  *See Place v. Abbott Laboratories*, 215 F.3d 803, 810-11 (7th Cir. 2000) (decision to split up workers whose personal problems impede or interfere with company goals is not prohibited retaliation).  Therefore, summary judgment is appropriate on Plaintiff's Title VII retaliation claim against Intel.

## II.  State-Law Claims

**Human Rights Act:**  Plaintiff's burden of establishing a prima facie case under the New Mexico Human Rights Act, NMSA § 28-1-7, is actually identical to his burden under Title VII.  *See Cates v. Regents of the New Mexico Institute of Mining & Technology*, 954 P.2d 65, 70 (N.M. 1998). For the reasons discussed above, Plaintiff has failed to establish a prima facie showing that Intel's or Leverenz' actions were the result of an intent to retaliate against him for his interview with Ms. Skelly.  In addition, as fully discussed in footnote 5 above, Armstrong's behavior toward Plaintiff cannot be considered retaliation for that interview, since Armstrong did not even know Plaintiff had

---

[8]  Plaintiff argues that Intel was trying to shut him up, by putting pressure on Pinkerton's to discipline him and then remove him from the Command Center.  The crucial question, however, is what the evidence shows concerning Intel's motive for shutting Plaintiff up.  There is no evidence that Plaintiff openly accused Intel, at the time in question, of a cover-up of the Brakob EEOC claim, or of any type of continuing discrimination in the Command Center.  Had that been the case, a Title VII claim might be viable.  Instead, the evidence is that Plaintiff disputed the accusations concerning "locker room" language, saying they were not true; asked Intel employees whether they had seen such behavior by Shift 5; protested the ambulance procedure Intel had adopted; and made several official and unofficial complaints about Mr. Armstrong's behavior and work performance.  These complaints and objections are unrelated to any Title VII concerns, and if Intel was trying to prevent Plaintiff from continuing to raise such issues by shutting him up, Title VII is not implicated in any way.

been interviewed.[9]  Therefore, summary judgment must be granted to all Intel Defendants on this claim.

**Intentional Infliction of Emotional Distress:**  Plaintiff conceded to the dismissal of the retaliatory discharge and negligence claims against the Intel Defendants, but continues to pursue his claims of intentional infliction of emotional distress ("IIED") and prima facie tort.  In order to survive summary judgment on the IIED claim against one or more of the Intel Defendants, Plaintiff had to present evidence raising a genuine issue of fact concerning the following elements:  (1) Defendants' conduct was extreme and outrageous; (2) Defendants' conduct was intentional or in reckless disregard of Plaintiff; (3) Plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between Defendants' conduct and Plaintiff's mental distress.  *See Trujillo v. Northern Rio Arriba Elec. Coop., Inc.*, 41 P.3d 333, 342-43 (N.M. 2001).  Plaintiff has failed to meet this burden with respect to at least two of the elements of IIED.  First, under the evidence submitted by Plaintiff, a reasonable jury could not find he suffered the type of severe emotional distress required to state an IIED claim.  Plaintiff did testify that his emotional distress was severe; however, he presented no facts tending to support this conclusory assertion.  Plaintiff did not visit a doctor or mental health specialist; he was not prescribed any medication; and he apparently had no trouble going back to work, as he found a new, higher-paying job with a car dealership days after a two-week visit to his brother in California.  (Gioia dep. pp. 259-61, 333-35, Exh. 1, Pltf. Resp. to Intel MSJ).

---

[9]  Plaintiff contends "there is reason to believe" that Armstrong did know about Plaintiff's interview, but in support of that assertion argues only that Armstrong's "physical threats" toward Plaintiff were a "dramatic escalation" of the poor temper he had displayed before January.  The facts do not support Plaintiff's contention.  Armstrong made one threat, probably directed at Plaintiff, *in the context of a particular dispute with Plaintiff*.  It is not possible to infer from this that Armstrong actually did know about Plaintiff's interview, or that this threat was in retaliation for that interview.  Instead, the uncontradicted evidence, vague as it is, is that the threat was a result of the dispute Plaintiff and Armstrong were embroiled in at the time.

A comparison with *Trujillo* is instructive. In that case, the plaintiff felt lousy and depressed, was prescribed an anti-depressant, slept long hours, and altered his eating habits during the period after he was fired. The New Mexico Supreme Court, noting that the law intervenes only where the distress inflicted is so severe that no reasonable person could be expected to endure it, held that the plaintiff's evidence of emotional distress was insufficient as a matter of law. Similarly, Plaintiff's evidence in this case, consisting solely of his assertion that he suffered "severe" emotional distress, is insufficient as a matter of law to state an IIED claim.

In addition, Plaintiff has failed to raise an issue of fact as to whether the conduct of the Intel Defendants was so outrageous as to be regarded as atrocious and utterly intolerable in a civilized community. *See Trujillo*. Mr. Leverenz, Mr. Armstrong, or some other Intel employee instigated false claims that all Shift 5 personnel were engaging in inappropriate behavior in the Command Center and caused them to be warned four days in a row to stop; an Intel employee also directed Mr. Hanzich, Plaintiff's superior, to write a memo to Shift 5's Sergeant Murphy, impliedly and unfairly criticizing Shift 5's performance on P.A. announcements; and Mr. Leverenz either perceived Plaintiff as a "smart ass" and wanted him removed from the Command Center, or told Mr. Shelton in effect that if it was a choice between Armstrong and Plaintiff, Plaintiff was the one who had to be removed from the Command Center. None of this is the stuff of atrocious, utterly intolerable conduct.[10]

Similarly, most of the actions Mr. Armstrong allegedly committed during his long-running feud with Plaintiff -- complaining to Plaintiff's supervisors about "gambling" in the workplace, attempting to shift blame from himself to Shift 5 personnel, slamming doors, glaring, and falsely accusing Shift 5 of using profanity in the Command Center -- are the type of petty, irritating

---

[10] Plaintiff appears to argue that any violation of federal or state law is automatically behavior that can be the basis of an IIED claim. The Court rejects this legally unfounded contention.

workplace harassments that many employees, unfortunately, are required to put up with every day. *See Beavers*, 901 P.2d at 768; *Vickers v. Abbott Laboratories*, 719 N.E.2d 1101 (Ill. App. 1999) (stating that courts must be extremely cautious in finding wrongful infliction of emotional distress in the workplace as all employees must tolerate petty annoyance). The one possible exception is the threat uttered by Armstrong, probably directed at Plaintiff (or at least interpreted that way by the Intel employee who reported it to Plaintiff), to the effect that "I guess it's time to take somebody out." Had this threat been made in Plaintiff's presence, accompanied by threatening gestures, or had Armstrong done anything to make Plaintiff actually feel threatened once he learned of Armstrong's statement, this may have been enough to constitute the type of conduct necessary to support an IIED claim. However, there is no evidence that Armstrong intended that Plaintiff hear the threat, or that he did anything to make Plaintiff believe the threat was serious. *See Bouie v. Autozone, Inc.*, 959 F.2d 875 (10th Cir. 1992) (stating that supervisor's racial slurs repeated secondhand to employee insufficient). As such, the only evidence presented to the Court is that the statement was akin to someone saying "I'd like to kill that guy!" in an angry moment, out of the presence of the putative murder victim, with no follow-up activity indicating that the statement might be considered a serious threat. One such statement cannot rise to the level of the atrocious, utterly intolerable conduct that must be present to state a claim for IIED.[11] Summary judgment will be granted on this claim.

**Prima Facie Tort:** The New Mexico courts have established the proper analysis for this cause of action. In *Beavers v. Johnson Controls World Servs.,Inc.*, 901 P.2d 761, 766-67 (N.M.App.

---

[11] Plaintiff did testify that Armstrong "was heard by many people almost on a daily basis making innuendos, threats, vial (sic) language..." (Gioia dep. p. 336, Exh. 1, Pltf. Resp. to Intel MSJ). These vague assertions are insufficient to merit consideration. *See Boyce v. New York City Mission Soc.*, 963 F.Supp. 290 (S.D.N.Y. 1997); *Rooney v. Witco Corp.*, 722 F.Supp. 1040, 1044 (S.D.N.Y. 1989). Furthermore, as noted above, Plaintiff presented no evidence that he suffered actionable, severe emotional distress as a result of Armstrong's alleged threats.

1995), the Court of Appeals held that a balancing test must be applied to determine whether the conduct in question justifies submission of the claim to the fact finder. The activity complained of must be balanced against its justification and the severity of the injury, weighing the injury, the culpable character of the conduct, the nature and significance of the interests promoted by the actor's conduct, the character of the means used by the actor, and the actor's motive. *Id.* The balancing process is applied once the plaintiff has presented evidence satisfying the elements of a prima facie tort, which are as follows: (1) the commission of an intentional lawful act; (2) with the intent to injure the plaintiff; (3) injury resulting to the plaintiff from the act; and (4) lack of, or insufficient, social or economic justification for the act. *Id.*; *E.E.O.C. v. MTS Corp.*, 937 F.Supp. 1503 (D.N.M. 1996).

In this case, unfortunately, Plaintiff has not specified what acts of the Intel Defendants might constitute a prima facie tort, or how those acts satisfy the requirements of the tort. The Court is therefore at a disadvantage in addressing this issue. Assuming Plaintiff would rely on the same actions discussed in the preceding sections, the Court finds they may not be the basis of a valid prima facie tort claim. For example, Intel's downgrading of the January CSR caused no direct injury at all to Plaintiff, cannot be said to have been motivated by an intent to injure him personally, and was based on a valid justification – Intel's displeasure with the training Pinkerton's had provided its employees concerning toleration of unacceptable language in the Command Center. Similarly, the fabricated accusations of profanity in the Command Center caused no direct injury to Plaintiff personally, other than annoyance; and cannot be said to have been intended to injure him in some tangible manner. The same is also true of the unwarranted memo concerning P.A. announcements; no injury or harm resulted from the memo, and there is no indication it was directed at Plaintiff personally.

As to Leverenz' expressed desire to have Plaintiff removed from the Command Center, Plaintiff did suffer an injury – he was removed from the Command Center and lost $1.00 per hour in pay. Clearly, however, Leverenz had the right to keep Plaintiff out of the Command Center if he wanted to; he testified that he could have barred Plaintiff from Intel's premises if he desired, although he had no power or authority to fire or discipline him. (Leverenz dep. p. 47, Intel Exh. D). According to the evidence in this case, Leverenz exercised his influence for one of two reasons: he perceived Plaintiff as a "smart ass," or he preferred to keep Armstrong in the Command Center rather than Plaintiff. Either of these justifications, even if misguided and unfair to Plaintiff, was adequate to preclude an actionable claim of prima facie tort. Employment decisions of this sort, especially in an employment-at-will situation such as Plaintiff's, cannot be the basis of a prima-facie-tort claim; otherwise the doctrine of employment at will must cease to exist. *Cf. Schmitz v. Smentowski*, 785 P.2d 726, 738 (N.M. 1990) (adopting prima facie tort doctrine and citing with approval case which held that the prima facie tort doctrine cannot be used to avoid employment at will principle).

Armstrong's conduct, similarly, cannot be the basis of a prima facie tort claim. His actions caused little or no injury to Plaintiff. Furthermore, his threat to "take out" Plaintiff was not said to Plaintiff's face and there is no evidence he intended to have the threat communicated to Plaintiff. *See Ewing v. State Farm Mut. Auto. Ins. Co.*, 6 F.Supp.2d 1281 (D.N.M. 1998). The element of intent to injure, therefore, is lacking. It simply cannot be a prima facie tort any time a person makes a threatening statement, out of the presence of the threatened person, absent evidence that the threat was genuine and not just grousing.

Plaintiff has failed to meet the elements of a prima facie tort and, applying the required balancing test, the Court finds this workplace dispute cannot give rise to an actionable claim of prima facie tort against the Intel Defendants. Summary judgment will therefore be granted on this claim.

**Pinkerton's Defendants**

**I.  Title VII Retaliation Claim-- Prima Facie Case -- Protected Conduct:**  Pinkerton's first argument with respect to the retaliation claim is that Plaintiff's participation in Intel's internal investigation was not conduct protected under Title VII.  A prerequisite of a retaliation claim, of course, is that the conduct retaliated against was protected conduct.  *See Williams v. Rice, supra.* Plaintiff gives this argument short shrift, contending without citation to authority that participation in an employer's internal investigation of a discrimination claim must be considered participating in any manner in an investigation, which is protected conduct under 42 U.S.C. § 2003-3(a).  Under the facts of this case, Plaintiff is correct.  This is because an EEOC claim had already been filed, and it was that official claim that Intel was investigating when Plaintiff was interviewed.  Had the Intel investigation come at a time when no EEOC claim was pending, Pinkerton's argument would be more problematic.  *See, e.g., E.E.O.C. v. Total System Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) ("participation clause" of Title VII does not include participating in employer's internal, in-house investigation, conducted apart from formal EEOC charge; it does protect activities which occur in conjunction with or after the filing of a formal charge with the EEOC).  The Court finds Plaintiff's participation in the interview conducted by Ms Skelly was conduct protected by Title VII's participation clause.[12]

**Prima Facie Case -- Adverse Employment Action:**  Pinkerton's next argues that the only action it took that might rise to the level of an actionable adverse employment action was the final demotion of Plaintiff from the Command Center.  The retaliatory acts of which Pinkerton's stands accused are the following:  (1) Lieutenant Hanzich's admonishments to Shift 5, several days in

---

[12]  Even if this determination is found to be incorrect, Plaintiff's actions in responding to the interviewer's questions could still be protected, under the "opposition clause" of Title VII.  *See Warren v. Ohio Dep't of Public Safety*, 2001 WL 1216979 (6th Cir. 2001).

succession, to cut out the locker room talk, even though no such conduct was occurring; (2) Hanzich's memo to Shift 5, indicating they were not performing P.A. announcements correctly, another false accusation; (3) Hanzich's verbal warnings to Plaintiff, concerning complaints that Plaintiff had not been courteous on the telephone when asked for assistance by contractors or other personnel; (4) Hanzich's action, perhaps in March, of understaffing Shift 5 for five weeks, which made their jobs more difficult; (5) Hanzich's April act of "kicking back" Plaintiff's one-on-one evaluation for a redo, resulting in a lowered score and marks of "does not meet standards" in two categories, the lowest evaluation Plaintiff had ever received (although the overall evaluation was still a "meets standards" evaluation); (6) the April 3, 2000, warning letter concerning Plaintiff's ongoing dispute with Armstrong; and (7) the May 1st, 2000, transfer of Plaintiff out of the Command Center to yard duty, with an accompanying $1.00 per hour cut in pay.

The Court agrees that many of these actions cannot be considered actionable, adverse employment actions. Accusations of locker room talk, inadequate performance of P.A. announcements, and discourtesy to clients, even if false, do not affect an employee's terms and conditions of employment to the degree necessary to constitute an adverse employment action. *See Nelson v. Upsala College*, 51 F.3d 383 (3rd Cir. 1995); *Moore v. Carlucci*, 1988 WL 17615 (N.D.Ill. 1988) *aff'd* 893 F.2d 1337 (7th Cir. 1989). Similarly, a temporary reduction in staff, without any evidence that longer working hours or some other tangible impact occurred as a result, is not an actionable adverse employment action. *See Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 555 (5th Cir. 1997).

The changed evaluation presents a more difficult question. An evaluation that indicates an employee meets the standards required of his position, even if the evaluation is lower than the employee's usual score, is not an adverse employment action, absent some evidence showing the

evaluation affected a subsequent promotion or demotion decision.  *See Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999) (lowered evaluation ratings did not establish adverse employment action, where employee received raises despite lowered ratings); *Smart v. Ball State Univ.,* 89 F.3d 437, 442 (7th Cir. 1996) (negative performance evaluations alone are not adverse employment actions); *Montandon v. Farmland Industries, Inc.*, 116 F.3d 355, 360 (8th Cir. 1997) (ruling that lower evaluation without direct consequences does not constitute adverse action); *cf. Meredith v. Beech Aircraft Co.*, 18 F.3d 890, 896 (10th Cir. 1994) (satisfactory evaluation, without explanation why it might be considered negative evaluation, and without any evidence of adverse action relating to the evaluation, was not actionable adverse employment action).  In this case, however, the two categories in which Plaintiff's scores were lowered were his teamwork with peers and his customer service skills.  Both of these categories could be construed to apply to Plaintiff's poor relationship with Jeff Armstrong, which was the basis for both the April 3 warning letter and the May 1st demotion.  Therefore, there appears to be a question of fact as to whether the lowered evaluation contributed to the subsequent adverse action that was clearly actionable.

Similarly, the April 3 warning letter was an obvious precursor to the May 1st demotion, and as such can be considered an adverse employment action.  In sum, this case involves one major adverse action, the demotion, but the lesser steps that led up to the demotion can also be considered as part and parcel of that action.

**Prima Facie Case – Causal Connection:**  As was the case with Intel, there is no direct evidence in this case of retaliation; that is, there is no direct evidence that Pinkerton's was angry at Plaintiff for attending the interview with Ms. Skelly, or for what he said during that interview about Mr. Brakob's charges of discrimination.  Therefore, Plaintiff must rely on circumstantial evidence such as temporal proximity.  The first adverse employment action taken by Pinkerton's was the April

3 warning letter. This letter was issued two-and-one-half months after Plaintiff's interview with Ms. Skelly. The Tenth Circuit has held that a one and one-half month period between protected activity and adverse action may, by itself, establish a prima facie showing of causation. *See Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir.1994). In contrast, the Circuit has held that a three-month period, standing alone, is insufficient to establish such a prima facie showing. *See Richmond v. ONEOK, Inc.*, *supra*, 120 F.3d at 209. The Circuit has recently declined, however, to decide which side of the line a period of two months and three weeks falls on. *See O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001). Because the Court, as discussed below, finds that Plaintiff has not made the requisite showing of pretext, the Court will assume that the time period in question is short enough that Plaintiff has created a prima facie showing of retaliation.[13]

**Legitimate non-Retaliatory Reason and Pretext:** Pinkerton's maintains that Plaintiff was removed from the Command Center because of his continuing dispute with Jeff Armstrong, his refusal to stop challenging Intel or Pinkerton's actions concerning the Command Center, and his negative attitude. These are legitimate, non-retaliatory reasons for Pinkerton's action. Thus, the burden shifts to Plaintiff to establish a question of fact of whether this proffered reason was actually a pretext for retaliating against him for his interview with Ms. Skelly. *See O'Neal*, 237 F.3d at 1252.

---

[13] In addition, Plaintiff presented evidence that he had an exemplary employment record prior to his interview, with no record of any type of discipline being imposed upon him and uniformly good performance evaluations. This was despite the fact that Mr. Hanzich testified that Plaintiff had always reacted negatively to any proposed changes in Command Center procedures. (Hanzich dep. pp. 64-66, Exh. 5, Pltf. Resp. to Intel MSJ). In other words, before Plaintiff's interview, his outspoken nature had not led to any type of discipline; after the interview, the same actions led to negative reactions from Pinkerton's. This change in Pinkerton's behavior also supports the finding that Plaintiff has presented a prima facie case of retaliation.

One difficulty facing Plaintiff in this task is that he openly admits he was having difficulty with Mr. Armstrong, and that he did question several actions taken by Pinkerton's or Intel. Plaintiff believed Armstrong was frequently not doing his job correctly, and Plaintiff lodged complaints about those incidents. He also maintained Armstrong lied to evade blame, placing the blame instead on Shift 5. (Gioia dep. p. 253, Exh. 2, Pltf. Resp. to Intel MSJ). Plaintiff complained about Armstrong during the Skelly interview, even though the interview was supposed to be about the Paul Hill issue and related incidents of ethnic harassments. Plaintiff complained again about Armstrong when he met with Mr. Creedon concerning the changed One on One evaluation. (Creedon dep. pp. 102-03, Exh. 4, Pltf. Resp. to Intel MSJ). Plaintiff also believed Armstrong was behind at least one of the false allegations that Shift 5 was engaging in locker-room talk. Plaintiff wanted to have a meeting with Mr. Leverenz and Mr. Creedon, to put an end to the Armstrong situation. (Gioia dep. p. 144, Pink. Exh. 17). In addition, Plaintiff did not simply accept the admonitions to refrain from such locker room talk, even though he was told to do so by Mr. Hanzich; he protested and personally investigated the matter by questioning Intel employees as to their perception of the accuracy of the accusation. (Gioia dep. pp. 183-84, Pink. Exh. 18). He also continued to raise the ambulance-procedure issue even after Intel had made a final decision on the matter, raising it with Mr. Creedon without informing Creedon that a final decision had already been made.

In this case there is overwhelming, uncontradicted evidence that Plaintiff was involved in an ongoing dispute with Armstrong, that was serious enough that he felt compelled to raise the issue repeatedly; even during an internal investigation of an EEOC charge. Intel employees such as David Crane noticed the tension in the Command Center between Armstrong and Shift 5, and were concerned enough about Armstrong's threat to "take somebody out" to report it to Plaintiff (although there is no evidence the threat was reported to Mr. Shelton or Mr. Creedon). Plaintiff's evaluation

marks were lowered, he was warned, and he was ultimately removed from the Command Center due to the ongoing conflict with Armstrong. In the face of this evidence, it is difficult for Plaintiff to legitimately raise an issue of fact that the actual reason for Pinkerton's actions was his interview with Ms. Skelly.

Plaintiff attempts to do so, first, by arguing that Pinkerton's failed to protect him from Armstrong's "retaliatory abuse." The Court recognizes that, if Plaintiff was being abused in retaliation for protected conduct under Title VII, and his employer added to the abuse by punishing him instead of stopping the abuse, a Title VII violation might be present. The problem with this argument in this case is that, as discussed above, there is no evidence at all that Armstrong's actions were motivated by a desire to retaliate against Plaintiff for giving a statement to Ms. Skelly. Armstrong did not even know Plaintiff had been interviewed by Ms. Skelly, and the tension between Shift 5 and Armstrong began several months before that interview, as a result of Armstrong's reaction to the affair rumors. Furthermore, there is no evidence that Armstrong was friends with Paul Hill, or had any other reason to be upset about Plaintiff's participation in the investigation of the Brakob EEOC claim. The only evidence is that Armstrong was angry about the affair rumors, which caused him to become surly and uncooperative, make up lies about Shift 5 as a result, and even threaten to take out Plaintiff, due to the charges Plaintiff was making about his performance. Plaintiff's interview with Ms. Skelly does not figure into this picture at all.

Plaintiff also argues that Pinkerton's gave in to pressure from Intel, and tried to shut him up instead of trying to do something about the real culprit, Armstrong. Plaintiff has presented ample evidence that Pinkerton's did attempt to silence his complaints and accusations, by having Mr. Hanzich tell him to shut up about the false locker-room-talk allegations, by giving him the warning letter concerning his dispute with Armstrong, by lowering his evaluation scores in two areas that are

connected to Intel/Pinkerton's relations, and finally by removing him from the Command Center. Again, however, the question is whether any of the complaints and accusations Pinkerton's was trying to silence were protected by Title VII. Plaintiff's objections to Shift 5 being told to knock off the locker-room talk are not protected; an employer has a right to admonish employees, even wrongly, to refrain from conduct that might itself result in a Title VII violation. The ambulance-procedure issue has nothing to do with Title VII concerns. Most importantly, Title VII is not concerned with enforcing fairness in the workplace. Therefore, Pinkerton's decision, however unfair it might have been, to try to enforce peace in the Command Center by focusing on Plaintiff and shutting him up instead of doing something about Armstrong's behavior, is not a Title VII matter. *See Place*, 215 F.3d at 810; *Miller v. Aluminum Co. of America*, 679 F.Supp. 495 (W.D.Pa. 1988) *aff'd* 856 F.2d 184 (3rd Cir. 1988); *EEOC v. Flasher Co.*, 986 F.2d 1312 (10th Cir. 1992) (Title VII not meant to remedy every workplace disagreement between employees and their supervisors).[14]

The only connection, supported by the evidence, between Plaintiff's treatment by Pinkerton's and the interview with Ms. Skelly, is a temporal one. Undisputed evidence, however, including direct evidence in the April 3 warning letter and the May 1 demotion memo, indicates the motivation for Pinkerton's actions was the continuing conflict between Plaintiff and Armstrong. The Title VII retaliation claim, therefore, is not meritorious.

**II. State Law Claims:** The state-law claims raised by Plaintiff against the Pinkerton's Defendants include a claim for violation of the New Mexico Human Rights Act ("HRA"); IIED; negligence; wrongful termination by constructive discharge; and prima facie tort. The analysis of the

---

[14] Similarly, Pinkerton's apparent decision to keep Intel happy by removing Plaintiff from the Command Center, rather than trying to have Armstrong removed or putting Plaintiff on a different shift, does not implicate Title VII concerns. As discussed above, there is no evidence indicating that Plaintiff's protected interview with Ms. Skelly was the source of Intel's desire to have Plaintiff removed from the Command Center.

HRA, IIED, and prima facie tort claims is the same for Pinkerton's as for Intel. Since Plaintiff failed to present a triable claim of retaliation under Title VII, he has similarly failed to present a triable HRA claim. Also, he did not present sufficient evidence of severe emotional distress, or atrocious and outrageous acts by any Pinkerton's Defendant, to survive summary judgment on the IIED claim. Finally, none of the Pinkerton's Defendants committed any acts that might be the basis of a prima-facie-tort claim; imposition of workplace discipline, even unfairly and wrongly, is not actionable under that tort under the circumstances of this case. *See Salazar v. Furr's, Inc.*, 629 F.Supp. 1403 (D.N.M. 1986) (stating that termination of pregnant employee just before vesting of pension because she was married to competitor is insufficient).

The negligence claim is difficult to address because Plaintiff has not specified what acts of the Pinkerton's Defendants constituted a failure to use ordinary care. All of the acts of which Plaintiff complains, the disciplinary actions and workplace decisions made by the various Pinkerton's Defendants, are ordinary employment decisions to which negligence principles ordinarily do not apply. For example, the Tenth Circuit has pointed out that New Mexico has not yet imposed liability for negligence in the context of employment terminations. *See Vice v. Conoco, Inc.*, 150 F.3d 1286, 1292 (10th Cir. 1998) (*citing Salazar v. Furr's, Inc.*, 629 F.Supp. 1403, 1410 (D.N.M. 1986)); *see also Hollars v. Southern Pac. Transp. Co.*, 792 P.2d 1146, 1156 (N.M.App. 1990) (J. Hartz, dissenting, pointing out same thing). In the absence of any argument from Plaintiff as to why a negligence tort should be allowed under the circumstances of this case, the Court declines to go out on a limb and insert negligence liability into the employment-relationship context. Summary judgment will therefore be granted on Plaintiff's negligence claim.

The lone remaining claim is the constructive-discharge claim. This claim fails for two reasons. First, Plaintiff admitted he was an at-will employee, and therefore can only contend he was

constructively discharged in violation of public policy. However, as discussed above, the employment actions taken were not in retaliation for any speech protected by public policy. Second, Plaintiff resigned because he was removed from the Command Center and lost $1.00 per hour in pay. He specifically testified that performing yard duty as a security guard would not be intolerable. He was not demoted from a supervisory position, so the only impact on him would have been the change in duties and the pay reduction of approximately 9.1%. Such treatment is not a constructive discharge. *See, e.g., King v. AC & R Advertising*, 65 F.3d 764 (9th Cir. 1995) (concluding that compensation reduction from $235,000 to $175,000 insufficient as a matter of law to cause constructive discharge); *McCann v. Litton Systems, Inc.*, 986 F.2d 946, 952 (5th Cir. 1993) (ruling that 12% decrease in pay plus loss of some supervisory responsibilities was not a constructive discharge).[15]

**Conclusion**

Plaintiff has obviously raised an issue of fact as to whether he was treated unfairly by Intel, Pinkerton's, or both. He has not, however, raised an issue of fact as to whether the unfair treatment was motivated by a desire to retaliate against him for his interview with Ms. Skelly.

---

[15] Plaintiff argues that Mr. Brakob resigned rather than be removed from the Command Center, proving that a reasonable person would find such treatment intolerable. In the face of Plaintiff's own testimony that yard duty would not be intolerable, and considering the slight decrease in pay involved, the Court disagrees that a reasonable person would find the transfer so intolerable that he would have no choice but to resign.

Furthermore, he has not raised an issue of fact as to any of the state-law claims he has attempted to insert into this workplace dispute.  Summary judgment will therefore be granted to all Defendants on all claims, and this case will be dismissed.

Dated this 28th day of March, 2002.


_____
BRUCE D. BLACK
United States District Judge

**ATTORNEYS**:

**For Plaintiff**:
D. Penni Adrian
Kathryn Hammel

**For Intel Defendants**:
Duane C. Gilkey
Trent A. Howell

**For Pinkerton's Defendants:**
Eleanor K. Bratton